**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| JOHN F. SINGER, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-72-GKF-TLW |
| | ) | |
| JANICE STEIDLEY and M. BRYCE LAIR, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Dkt. #80] filed by defendants Janice Steidley ("Steidley") and M. Bryce Lair ("Lair"). Defendants seek summary judgment against plaintiff John F. Singer ("Singer") on his claims for violation of his First Amendment rights of free speech and association and state law claims for libel, slander and defamation.

On February 4, 2013, John Singer, a Claremore Police Department investigator, filed suit in this court alleging Janice Steidley and M. Bryce Lair—the District Attorney and First Assistant District Attorney, respectively, for Craig, Mayes Rogers Counties, Oklahoma—manufactured evidence that he had lied in sworn statements concerning a criminal investigation 18 months earlier, and then reported the alleged misconduct to law enforcement officials, courts and criminal defense attorneys, purportedly pursuant to *United States v. Giglio*, 405 U.S. 150 (1972).[1] Singer claimed that defendants undertook these activities to retaliate against him for being a vocal critic of their performance in the District Attorney's office. In his original

---

[1] In *Giglio*, the Supreme Court held that where the reliability of a witness may be determinative of guilt or innocence of a criminal defendant, nondisclosure of material evidence affecting the reliability of the witness justifies a new trial. 405 U.S. at 153. Under *Giglio*, the prosecution must disclose during pretrial discovery "evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings." *U.S. v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003).

Complaint, Singer asserted claims for violation of his First Amendment rights of free speech and association and his Fourteenth Amendment property and liberty interests; exemplary damages; declaratory judgment and injunctive relief.

Defendants moved to dismiss the Complaint.  The court granted the motion in part and denied it in part, dismissing Singer's claims for violation of his Fourteenth Amendment rights, declaratory judgment and injunctive relief. [Dkt. #19].   It also dismissed his claim for violation of his First Amendment rights to the extent it was based on alleged disclosures of *Giglio* material to the U.S. Attorney for the Northern District of Oklahoma and defense attorneys in Rogers County District Court criminal cases. [*Id.*].

With leave of court, Singer filed a First Amended Complaint which added state law claims for libel, slander and defamation.  [Dkt. #30].  Defendants' motion to dismiss the new claims was denied.  [Dkt. #78].

The case is set for jury trial on April 21, 2014.  In the pending motion, defendants seek summary judgment in their favor on all of plaintiff's claims against them.

## I. Material Facts

Singer is an investigator with the Claremore Police Department ("CPD").  [Dkt. #30, First Amended Complaint, ¶7].  At all relevant times, Steidley has been the District Attorney and Lair the First Assistant District Attorney for the Twelfth Judicial District of Oklahoma.  [*Id.*, ¶¶2-3].

From July 23-29, 2011, Singer conducted an investigation of Matthew Grant Sunday ("Sunday") in connection with the alleged sexual abuse of a minor female.  In the course of his investigation, Singer prepared a Report of Investigation, an Affidavit for Search Warrant and a

Claremore Police Arrest Affidavit and Booking Form. [Dkt. #80, Exs. B, C and D].

Additionally, Singer's interview of Sunday was videotaped.  [*Id.*, Ex. E, Interview DVD].

On August 31, 2011 Sunday was charged with eight counts, including Second Degree

Rape by Instrumentation, in Rogers County District Court, Case No. CF-2011-526 ("*Sunday*

case").[2]  On January 11, 2012, all charges except two counts of providing alcohol to a minor in

violation of 37 Okla. Stat. § 537 were dismissed on the state's motion.  On July 2, 2012, Sunday

pled guilty to the two counts of furnishing an alcoholic beverage to a minor.

At some point in time, Steidley and Lair reviewed Singer's actions in the *Sunday* case to

determine whether his conduct should be disclosed under *Giglio*. [Dkt. #80, Defendants'

Responses to Plaintiff's First Interrogatories Exs. G and H, pp. 5-6].  Ultimately, defendants

prepared a packet of information relating to the *Sunday* case to be disclosed to defendants in

criminal cases in which Singer would be testifying on behalf of the State. [Dkt. #80, Ex. N.,

Steidley Affid., ¶7].[3]  Collectively, those documents are referred to as the "*Giglio* materials."

The timing and motivation of defendants' *Giglio* review are hotly contested, as is the

conclusion defendants reached based on the review.

Defendants contend that although Singer's report and affidavits represented Sunday had

admitted he had inserted his finger into the alleged victim's vagina "against her will," the DVD

confession of Sunday does not support this claim.  [*Id.*, Statement of Undisputed Material Fact

---

[2] "Rape by instrumentation" is statutorily defined as "an act . . . in which any inanimate object or any part of the human body, not amounting to sexual intercourse is used in the carnal knowledge of another person without his or her consent and penetration of the anus or vagina occurs to that person.  Provided, further, that at least one of the circumstances specified in Section 1111 of this title has been met; . . ." 2l Okla. Stat. § 1111.1.  Section 1111 defines "rape" as occurring under certain circumstances, including "[w]here force or violence is used or threatened, accompanied by apparent power of execution to the victim or to another person."

[3] According to Steidley, those materials included (1) an enhanced audio CD of Singer's interview of Sunday [Dkt. # 80, Ex. M]; (2) a DVD of Singer's interview of Sunday provided by the CPD [*Id.*, Ex. E]; the Report of Investigation completed and signed by Singer [*Id.*, Ex. B]; the Affidavit for Search Warrant completed and signed by Singer [*Id.*, Ex. C]; the Claremore Police Arrest Affidavit and Booking Form for the arrest of Sunday, completed and signed by Singer [*Id.*, Ex. D]; and the January 21, 2013 report prepared by Investigator Gary Stansill concerning his review of Singer's investigation materials [*Id.*, Ex. L]. [Dkt. #80, Ex. N, Steidley Affid., ¶7].

#5; Exs. B-E].  Singer argues that although Sunday did not state in so many words that that he had "acted against the victim's will," his statements and admissions in the course of the interview established that, in fact, Sunday acted against the victim's will.

Further, Singer asserts that Steidley and three of her ADAs reviewed all of the investigative material Singer prepared in the case before charging Sunday and determined there was sufficient evidence to charge Sunday with Second Degree Rape by Instrumentation.  In her deposition, Steidley admitted the video of the interrogation was reviewed by her office and she met with Assistant District Attorney Kathy Lahmeyer and investigator Gary Stansill and discussed the case before charges were filed. [Dkt. #90, Ex. 1, Janice Steidley Dep., 48:14-51:16].

The exact timing of defendants' *Giglio* review is unclear.  In her November 13, 2013 deposition, Steidley testified the determination that the *Sunday* evidence was *Giglio* material was made before her meetings with CPD Chief Brown and Pryor Police Chief Nichols on January 7 and 8, 2013, but she did not know when her prosecutors reviewed the evidence.  [Dkt. #90, Ex. 1, Steidley Dep., 36:18-37:11].[4]  In an affidavit executed November 25, 2013, Steidley stated the *Giglio* review "began in 2012, months before the disclosures of the *Giglio* Materials."  [Dkt. #80, Ex. N, Steidley Affid., ¶4].

The parties dispute the motivation for the review.  In her affidavit, Steidley  states:

> It was brought to my attention by an attorney in our office that Officer John Singer . . . may have engaged in activities that would call his credibility into question in connection with a rape investigation he conducted in 2011.  That investigation resulted in charges being filed against Matthew Grant Sunday (the *Sunday* Case).  There was a question of whether Officer Singer's conduct in connection with the *Sunday* Case should be disclosed to defense counsel under the Supreme Court case of *Giglio v. United States*, 405 U.S. 150, 154 (1972).

---

[4] Steidley stated the *Giglio* determination was made "prior to my meeting with [Claremore Police Chief] Stan Brown [January 8, 2013] and prior to my meeting with [United States Attorney] Mr. Williams [January 7, 2013]." [Dkt. #90, Ex. 1, Steidley Dep. 37:6-7].

[Dkt. #80, Ex. N, Steidley Affid., ¶3].

Singer, however, argues a *Giglio* review was performed before charges were ever filed, and the subsequent review and disclosures by defendants were in retaliation for his criticism of Steidley's performance as district attorney.

The evidentiary materials establish the following chronology:

### *Claremore Progress* Article on Rogers County Drug Bust

On January 6, 2013, Salesha Wilken ("Wilken"), a reporter for the *Claremore Daily Progress* ("*Progress*"), authored an article entitled "The Clock is Ticking," describing the aftermath of a historic drug bust from 2011.  [Dkt. #80, Ex. R, Wilkin Dep., 9:11-17; Ex. S, Article].  The article detailed the disposition of charges against 69 individuals and stated that "the long-term impact on drug traffic has yet to be determined," and "[t]he convictions carried a minimal penalty, according to some officials." [Dkt. #80, Ex. S, Article].  Singer was interviewed in connection with the article and provided information that was critical of the DA's performance.  [Dkt. #90, Ex. 14, Plaintiff's Supplemental Responses to Defendant Steidley's First Discovery Requests, Answer to Interrogatory No. 1, ¶12].

### Disclosure of *Giglio* Materials to U.S. Attorney

As the court noted in its Opinion and Order on the first Motion to Dismiss [Dkt. #19] and as alleged in ¶22(a) of the First Amended Complaint, on January 7, 2013 defendants provided the *Giglio* materials to the United States Attorney for the Northern District of Oklahoma and defense counsel in cases in which Singer would be a witness.  This court ruled those disclosures were privileged.

## Disclosure of *Giglio* Materials to CPD Chief Brown

On January 8, 2013, at Steidley's request, CPD Police Chief Stan Brown met with defendants. [Dkt. #80, Ex. O, Stanley Brown Dep., 59:17-23, 61:3-9]. Chief Brown testified that during the meeting, defendants expressed "their concerns that John Singer had made misstatements in a[n] affidavit that they had in regard to videotaped confession of a suspect." [*Id.*, 62:8-11]. He testified defendants gave him a packet that included a probable cause affidavit for a search warrant and an "unauthorized, uncertified copy of a transcript relating to the videotaped interview." [*Id.*, 65:6-15; *see also* Ex. N, Steidley Affid., ¶9].

In her affidavit, Steidley avers that her "sole purpose" in meeting with Chief Brown was to "inform[] him of my concerns with respect to the *Sunday* Case and Officer Singer," and "was in no way to 'retaliate' against Officer Singer." [Dkt. #80, Ex. N, Steidley Affid., ¶9]. Chief Brown testified he did not consider defendants' statements to be unprofessional or improper in any way. [Dkt. #80, Ex. O, Brown Dep., 63:10-64:1]. In response to the question, "Did both these prosecutors seem genuinely concerned about the issue that they may have with Mr. Singer's credibility?" he stated: "There was—I think we all realized the seriousness about the allegation. I mean I wouldn't—I don't know if 'concern' is the right term or the right definition of it, but there is a—I think there was mutual respect for the seriousness or gravity of this allegation." [*Id.*, 64:2-11]. Chief Brown testified he had no criticism of defendants for asking to meet with him and discuss an issue with an officer or the credibility of an officer. [*Id.*, 61:10-22]. When questioned by counsel for defendants, he testified:

> Q: Did they seek your input as to—I mean did they ask you what they should do? Or how did the conversation go from there?
>
> A: They didn't ask me what they should do. They presented the documents, didn't have a lot of time to peruse the documents. Just basically told me what

they felt was the context of them.  And, of course, I'm stunned.  It's a serious allegation.

Q:  Right.

A:  And I made reference to that effect, "this is a serious allegation."  I recall Ms. Steidley saying, "yes, it's possibly a career-ending issue."

I think Bryce had interjected himself into the conversation somewhat, basically along the same lines.  And I told them, because of the seriousness of the allegations, I would need to first review the material and speak with my legal counsel and my boss, and we would go from there. . . .

[*Id.*, 62:12-63:4].

### Meeting With Pryor Police Chief Nichols

At Steidley's request, on January 9, 2013, Dennis Nichols, the Chief of Police for the Pryor Police Department, met with Steidley and Lair in Nichols' office.  [Dkt. #80, Ex. P, Nichols Dep., 7:19-8:7].  James Willyard, a sergeant with the Pryor Police Department, attended the meeting and (without the knowledge of Nichols, Steidley or Lair) recorded the conversation that took place.  [*Id.*, 8:15-25].  Willyard testified he learned of the issues stemming from the *Sunday* case from Singer on January 8.  [Dkt. #80, Ex. Q, Willyard Dep., 19:5-19].  He testified Singer told him Steidley had spoken to Chief Brown and "said that he was—I guess lied in an affidavit."  [*Id.*, 19:5-8].  Defendants did not give Chief Nichols the *Giglio* materials, and did not use Singer's name until Willyard mentioned it.  [*Id.*, 45:13-18; *see also*, Ex. P, Nichols Dep., 20:19-25].  A partial transcript of the recorded meeting reflects that Steidley and Lair told Chief Nichols and Willyard they believed Singer was *Giglio* impaired and discussed the basis for their belief.  [Dkt. #90, Ex. 6, Transcript of 1/9/13 Meeting at Pryor Police Department, 11:25-6:23].[5]

---

[5] Chief Nichols testified he believed the purpose of the meeting was that Steidley and Lair wanted to complain to him about a Facebook post by Willyard.  [Dkt. #80, Ex. P, Nichols Dep., 14:17-15:1].  According to Chief Nichols, Willyard was alleged to have "made some comment, does anyone know someone that's interested for position of district attorney or something of that nature. . . ." [*Id.,* 15:2-5].  As one can tell from the portions of the transcript included in plaintiff's response, the exchange between Steidley and Willyard was heated. [Dkt. #90, Ex. 6].

Sometime after the January 9, 2013 meeting, Willyard and Singer provided the *Giglio* materials to Chief Nichols on their own accord.  [Dkt. #80, Ex. P, Nichols Dep., 17:8-20].

### Stansill Report

Also on January 9, 2013, Lair asked District Attorney investigator Gary Stansill to prepare a report on his involvement in the *Sunday* case investigation.  [Dkt. #80, Ex. L, Stansill Report].  The Stansill report, which is dated January 21, 2013, is based on Stansill's review of his worksheets from the period of the *Sunday* case investigation, August 15-30, 2011.  [*Id.*].  According to the report, on August 15, 2011, Singer expressed concern to Stansill because he had presented the Sunday case to the District Attorney's office, but charges had not yet been filed.  He told Stansill he had obtained a confession from the suspect in the case, and he was upset because ADA Kathy Lahmeyer wanted to review the video of his interview with the suspect before she filed any charges.  Between August 15-19, 2011, Stansill talked with Lahmeyer, who told him she was waiting for the video of the suspect interview before filing charges.   On August 19, 2011, Stansill met again with Lahmeyer, who had just received the video.  He and Lahmeyer watched portions of the video but had difficulty hearing some of the conversations between Singer and Sunday.  He took the case file and a copy of the video home that weekend for further review.  On Monday, August 22, 2011, he met again with Lahmeyer and discussed the *Sunday* case.   Neither Lahmeyer nor Stansill could hear a confession on the videotape.  On August 24, 2011, Stansill, Lahmeyer and ADA Tim Wantland interviewed the victim and had discussions with her father.  Afterward, Stansill and Lahmeyer met with Steidley and had further discussions about the case.  On Tuesday, August 30, 2011, Stansill had further discussions about the case with ADAs Lahmeyer, Don Palik and Wantland.  Stansill stated, "Part

of the discussion had to do with whether or not there were sufficient elements to file a charge of 2nd Degree Rape by Instrumentation" or alternatively, Sexual Battery. [*Id.*].

Stansill states in the report, "After the above meeting [of 8/30/11] I do not recall having any specific meetings or conversations regarding this case (until meetings with Janice Steidley and Bryce Lair in early January 2013)." [*Id.*].

### Oklahoma Criminal Defense Lawyers Association Website

Josh Lee ("Lee"), an attorney in private practice in Vinita, Oklahoma, is a close personal friend as well as personal legal counsel to Lair.  [Dkt. #80, Ex. V, Lee Dep., 5:5-8; 7:11-21; 17:21-18:4].  On January 17, 2013, Lee posted a comment regarding rumors he had heard about Singer on the Oklahoma Criminal Defense Lawyers Association ("OCDLA") website by email. [*Id.*, 25:1-17; Dkt. #80, Ex. W, Lee Emails].  The email stated:

> FYI for those of you around NE Oklahoma who may have cases in state or federal court with this guy:
>
> I can't get very many details but there is something going on with him and some possible Giglio issues.  From what I can put together it appears that he arrested a guy for some sort of a sex crime and put in a search warrant affidavit as well as a PC affidavit that he got a confession.  Apparently after the DAs office reviewed the video it allegedly wasn't true.  Thank god they looked—props to them!
>
> Just wanted y'all to know so you don't dispose of any cases of his without asking for information on this issue.  One court official told me he has even hired an attorney to help him with possible perjury issues.  I doubt very seriously it would go that far but it's still worth knowing about for your cases.  So start asking questions.

[Dkt. #90, Ex. 11, OCDLA posting].

Lee denies he sent the OCDLA email at Lair's request or direction.  [Dkt. #80, Ex. V, Lee Dep., 33:3-11].  He testified the content of his post came from a conversation he had with his law partner, Clint Ward.  [*Id.*, 31:9-32:5].  Counsel for Lee, Dennis Caruso, declined to allow Lee to testify about the early January, 2013 conversation between Lee and Lair based on

attorney-client privilege.  [Dkt. #90, Ex. 9, Lee Dep., 9:13-10:6].  Lee did testify that he was retained by Lair because of issues relating to Singer.  [*Id.*, 25:21-26:4; 30:12-14].  At the time Lair retained Lee, there was no pending or threatened litigation against Lair by Singer or anyone related to Singer.  [Dkt. #90, Ex. 10, Lair Dep., 5:6-16].

The OCDLA does not have any materials in its possession relating to Singer, nor does it have any materials received directly from Steidley or Lair.  [Dkt. #80, Ex. X, OCDLA Response to Subpoena].

### Claremore Daily Progress Story on *Giglio* Allegations

On February 1, 2013, The *Progress* printed an article authored by Wilken titled "DA Steidley targets CPD Officer with Giglio." [Dkt. #80, Ex. T].  The article reported that Singer and the City of Claremore had filed motions to intervene in a Rogers County District Court case in which Steidley had mailed information to defense attorneys concerning Singer's role in the *Sunday* case.  [*Id.*].  It quoted attorney Ballard as saying, "The city does not agree with the district attorney's allegations.  We believe this matter should be decided by a neutral judge, rather than by unilateral action of the DA's office that will destroy a distinguished officer's career."  [*Id.*].

Wilken later testified she obtained the *Giglio* materials via an internet link to court filings made by the City of Claremore in *State of Oklahoma v. Jennie Runions*, Rogers County Case No. CF-2012-655.  [Dkt. #80, Ex. R, Wilken Dep., 70:6-8, 75:1-76:14].  She did not receive any of the *Giglio* materials from Steidley or Lair or from any other attorney in Steidley's office.  [*Id.*, 76:15-77:2, 95:24-96:11].  The publisher of the Progress, Bailey Dabney ("Dabney"), confirmed that Steidley and Lair provided no *Giglio* materials to the Progress.  [Dkt. #80, Ex. U, Dabney Dep., 115:22-116-21].

Wilken testified Lair had never made any disparaging comments about Singer to her. [Dkt. #80, Ex. R, Wilken Dep., 82:22-83:12]. With respect to the same question regarding Steidley, Wilken testified, "I believe that, during our conversation, her innuendo that John Singer was the person behind my stories would be construed as a negative comment towards him, yes." [*Id.*, 78:25-79:1; 79:23-80:9].[6]

### Singer's Employment with CPD

To date, Singer remains employed by the CPD. [Dkt. #19, Opinion and Order at 14 (noting that "Singer's employment has not been terminated; therefore, he has no basis to assert a deprivation of his property interest.")]. In a CPD media release dated February 22, 2013, Chief Brown stated a review of Singer's actions by a senior officer in an independent police department outside of Rogers County, performed at the request of CPD, had "completely exonerated [Singer] from any wrongdoing." [Dkt. #80, Ex. Y, CPD Press Release]. The media release stated:

> Det. Singer was previously asked to not undertake any new investigations while this process played out. With today's ruling, there is no decision pending and any restrictions on Det. Singer's investigative activities are hereby lifted. Det. Singer is fully authorized to do the job for which he was hired—to investigate criminal activity and to work to keep our citizens safe. The City has full confidence in his ability to do so.

[*Id.*]. However, in his deposition on September 11, 2013, Chief Brown testified:

> Q. If it's determined by a reviewing authority that Mr. Singer, in fact, did commit perjury in the Sunday case, what would be your action, if anything, with regard to that employee?
>
> A. Well, I think Mr. Singer gets due process in this matter. If you're going to accuse him of felony crime, he's no different than anyone else, that if they felt

---

[6] Attached to defendants' summary judgment motion is a partial transcript of a conversation between Steidley and Wilken about the District Attorney's *Giglio* disclosure. [Dkt. #80, Ex. K]. In that conversation, Wilken questioned Steidley about the time lag between the *Sunday* investigation and the *Giglio* disclosures. Wilken also asked Steidley why—approximately one week before the January 8, 2013 *Giglio* disclosure to the City of Claremore—the District Attorney subpoenaed Singer to be an expert witness in another case. [*Id.*, 15:10-23].

that there was the ability to prosecute him or to convict him of a crime or, say, press charges on him, let him go through the due process.  If he is found guilty of perjury, I have no other recourse other than to terminate him.  He would be a criminal.

[Dkt. #90, Ex. 5, Brown Dep., 90:15-91:2].

Additionally, Rex Duncan, the District Attorney for District 10, Osage and Pawnee Counties, in a September 4, 2013 letter to Lair, referenced a press conference earlier in the day, during which CPD Chief Brown had reportedly stated that no District Attorney office in Oklahoma would pursue charges against Singer for perjury. [Dkt. #90, Ex. 4, 9/4/2013 Letter from Duncan to Lair]. In his letter, Duncan stated that on January 24, 2013, the Oklahoma Attorney General's Office appointed his office to handle perjury allegations against Singer. Following his review of the file, he requested an investigation by the Oklahoma State Bureau of Investigation ("OSBI").  He stated that he was prepared to file felony perjury charges against Singer pending completion of an investigation.  However, in a letter dated August 12, 2013, the Attorney General's Office advised Duncan that the Singer matter had been reassigned to District Attorney Dennis Smith, District 2 (Beckham, Ellis, Custer, Roger Mills and Washita Counties). [*Id.*]. Duncan stated that between January 2013 and August 8, 2013, he spoke with several OSBI employees about the Singer matter and he believed his intent to file perjury charges was evident from his comments.  He concluded:

To the best of my recollection, I've never met Claremore Chief Stan Brown and I don't know where he got his information, "that the Attorney General's office nor any other Oklahoma District Attorney will pursue charges against Singer for perjury."  That statement just isn't accurate and he certainly would not have drawn such a conclusion if we'd spoken about the matter.

[*Id.*].

### Previous *Giglio* Impairment

In *United States v. Stout*, Case No. 10-CR-50-JHP (N.D. Okla.), the court concluded

Singer's dishonesty and cover-up concerning an accident involving his police vehicle should be

disclosed to criminal defense attorneys.  [Dkt. #80, Ex. A, Plaintiff's Supplemental Responses to

First Discovery Requests, Responses to Request for Admission 1-4].[7]  Singer rear-ended another

police vehicle with his own police vehicle, then lied to his supervisor, claiming to have collided

with a deer.  To promote his story, Singer placed deer hair in the grill of his vehicle.  [Dkt. #80,

Ex. Z, Transcript of Proceedings in *U.S. v. Stout*].  Chief Brown is aware that Singer is subject to

*Giglio* disclosure for his conduct surrounding the accident.  [Dkt. #104, Ex. O, Brown Dep.,

21:25-25:25].

### Singer's Previous Exercise of First Amendment Right to Free Speech

In response to a discovery request by defendants, Singer identified a number of instances

in which he exercised his right of free speech, which he contends led to retaliation by defendants.

[Dkt. #90, Ex. 14, Plaintiff's Supplemental Responses to Defendant Steidley's First Discovery

Requests, Answer to Interrogatory No. 1].  In that response, Singer stated:

> I have complained about the poor performance of Steidley and Lair in a number
> of instances, including:
>
> 1. In the summer of 2011, I discussed Lair's bad reputation with Steidley.
>    Steidley and I discussed negative things I had heard about Lair and how he
>    obviously has a poor opinion of police officers. Steidley said that Lair didn't

---

[7] In *Stout*, United States Magistrate Judge McCarthy entered a Report and Recommendation [Case No. 10-CR-50-JHP, Dkt. #44]  recommending that defendant's Motion to Quash Statements and Evidence Due to Illegal Arrest [*Id.*, Dkt. #28] be denied.  The defendant objected to the Report and Recommendation, arguing, *inter alia*, the Magistrate Judge improperly found the inaccuracies in the Search Warrant Affidavit were neither intentional nor made in reckless disregard for the truth, and therefore did not invalidate the warrant.  District Judge James H. Payne found "no reason to disagree with the Magistrate Judge's conclusion that Singer's testimony at the suppression hearing was credible," and stated, "Although Investigator Singer testified he lied to his supervisor and went through great lengths to cover up a car accident he had in his police issued vehicle approximately 10 years ago, this Court does not feel this information is sufficient to find his entire testimony to be any less credible." [*Id.*, Dkt. #48 at 4 (footnote omitted)].

like cops because a former girlfriend had engaged in an affair with a police officer.

2.  In mid to late 2012, I was in Judge Condren's chambers obtaining a search warrant when the conversation turned to the topic of the poor performance of the District Attorney's Office and specifically Steidley and Lair's performance. I discussed with Judge Condren the lack of trust that existed between law enforcement and the DA's Office. Judge Condren suggested that she would talk to Steidley about my concerns. I told her to feel free to do but said I did not expect any improvement.

3.  In late 2012, another person and I encountered Jack Gordon[8] in the parking lot of the courthouse in Claremore. We discussed with Gordon the poor performance of the DA's Office in prosecuting crime, leading law enforcement, and supporting crime victims. Specifically, we discussed the large amount of time I spent in federal court because of the inabilities of the Rogers County DA's Office. Gordon attempted to ease my concerns by saying he heard a man was planning on running against Steidley in the next election.

4.  On a number of occasions in his office and in the courthouse, I discussed Steidley and Lair's poor performance with Bill Higgins.[9] I discussed with Higgins specific grievances that included their total inability to handle serious or complicated prosecutions. I explained my belief that Steidley and Lair had made the drug problem in Rogers County worse through their inconsistent and incompetent drug prosecution. I complained about the various promises Steidley made to obtain campaign endorsement from law enforcement that she failed to deliver. Higgins and I discussed whether I should approach Steidley and attempt to discuss my concerns. On at least one occasion, we discussed our belief that Lair controlled Steidley and the bad relationship had gone too far for repair.

5.  Since mid 2011, I have had dozens of conversations with Jan Reincke[10] about Steidley and Lair's inability to competently prosecute more than the simplest crimes. When presenting cases that would typically be considered state crimes, Reincke and I would discuss the need to indict the suspects because of the problems in the DA's Office.

6.  On August 13, 2012, Judge [Dwayne] Steidley called a meeting with law enforcement, prosecutors, defense attorneys, and Judge Crosson. The purpose of the meeting was to discuss the practice of obtaining arrest warrants before charges were filed by the DA. During that meeting, I complained to the group that the DA's Office refused to respond to serious crimes in a timely manner, creating the occasional need for the pre-filing arrest warrants. I also

---

[8] Gordon is an experienced criminal defense attorney in Claremore.
[9] Higgins is another experienced criminal defense attorney in Claremore.
[10] Reincke is an Assistant United States Attorney in the Northern District of Oklahoma.

complained that the DA's Office should be representing the needs of law enforcement at the meeting, not a police officer.

7. On November 21, 2012, I met with Tim Wantland[11] about Lair's attempt to cause two dangerous men to be released from jail. I complained to Wantland about the relationship with the leadership in the DA's Office.

8. On a number of occasions, I explained to victims of crime that they would likely deal with incompetence and indifference from the DA's Office. I have briefed crime victims on my belief that Steidley and her assistants care more about maintaining friendships with defense attorneys than the prosecution of crime. I have prepared victims for the large number of passes they should expect and the need to stay engaged with the DA's Office so they are not forgotten.

9. To various police officers on a number of occasions, I have discussed my belief that Lair hates police officers and can use his authority to harm officers' career[s].

10. While teaching various law enforcement seminars, I have discussed with students the incompetence of Steidley and her assistants.

11. In October or November 2012, Dusty Singer[12] asked me if my wife planned to run for DA. Knowing that Dusty Singer would report my response to Steidley, I said that my wife was going to run for the office. I told him that Steidley had done such a poor job as DA and could not possibly be enjoying herself in the position [and] that I thought she might not seek reelection.

12. In late 2011, a Claremore Progress reporter approached me about writing a story about the large drug distribution operation the year before. I told him that the DA's handling of those prosecutions had been poor and there was nothing good to report in the newspaper. I said that I believed the DA's Office had made the drug problem worse through their handling of the cases so I spoke against writing the story. In late 2012, Progress reporter Salesha Wilken approached me for the same purpose and wanted to write a story about the operation two years later. With approval from the Chief of Police, I provided Wilken information about the operation and the disposition of each of the cases. On January 6, 2013, the Claremore Progress wrote two articles with information I provided that were critical of the DA's performance.

[*Id.*].[13]

---

[11] Wantland is an Assistant District Attorney in Steidley's office.

[12] Dusty Singer is a Claremore police officer.

[13] Generally, defendants do not dispute Singer's allegations about the instances in which he criticized them.  [Dkt. #101, Reply at 1-4].  With respect to statement #1, they contend  that "a singular incident that occurred nearly two years prior to the defendants' alleged retaliation" is insufficient to demonstrate the type of "motive" required to

Additionally, in a July 5, 2011 interoffice memo to Chief Brown, Singer stated that in late June 2011, he assisted DA investigator Roy Dowden in a background investigation of an employee of the DA's office; the investigation revealed problems with the employee's background "which created significant controversy with the leadership in the DA's Office." [Dkt. #90, Ex. 15, Singer memo to Brown]. He stated that Lair had been heard telling others "that he intends to damage my career." [*Id.*]. As a result, Singer stated he did not wish to be a member of the District Attorney's Drug Task Force.[14]

Finally, in the Argument and Authorities section of his response, plaintiff asserts defendants made *Giglio* disclosures to Claremore City Manager Jim Thomas, Salesha Wilken, John Wiley (a Claremore insurance agent) and Rhett Morgan (Tulsa World reporter). [Dkt. #90 at 26]. Plaintiff cites his response to discovery requests [Dkt. #90, Ex. 14, Resp. to Interrog. No. 12] in support of this allegation.[15]

## II. Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998). A

---

prove his claims. [*Id.* at 2-3]. They assert that statements #2- #9 and #12 are immaterial because Singer cannot establish defendants had any knowledge of the statements. [*Id.* at 3]. However, at least with respect to statement #12, based on Wilken's testimony, Steidley knew or believed Singer was the source of the drug bust article. Defendants contend statements #9 - #11 are not supported by admissible evidence.

[14] The statements attributed to Lair are clearly inadmissible hearsay.

[15] Singer's discovery response is inadmissible hearsay. In it, Singer identified individuals to whom he claims defendants disclosed *Giglio* material.

court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted).

"An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  . . .  An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670 (citations omitted).  In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Id.* at 252.

### III. Analysis

### A. First Amendment Retaliation Claim

To prove a First Amendment retaliation claim against non-employer defendants, a plaintiff must establish that:  (1) he was engaged in constitutionally protected activity; (2) defendants' activities caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) the defendants' adverse action was "substantially motivated as a response to the plaintiff's exercise of constitutionally

protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212-13 (10th Cir. 2000).  As set forth below, the parties agree that Singer's criticism of defendants' performance in the District Attorney's office was "constitutionally protected activity," and the first element has therefore been established.  Defendants contend, though, that the second and third elements have not.

### 1. Whether Defendants' Activities Caused Plaintiff to Suffer an Injury

The second element of Singer's claim requires the court to answer two questions:  First, did defendants make disclosures of *Giglio* materials and/or allegations that Singer was *Giglio* impaired to anyone?  Second, was plaintiff arguably injured by such disclosures and if so, was the injury one which would tend to chill a person of ordinary firmness from continuing to engage in constitutionally protected activity?

### a. Whether Defendants Made Disclosures of *Giglio* Material/Information to Claremore Police Chief Brown

It is undisputed that defendants, in a January 8, 2013 meeting called by Steidley, discussed with Claremore Police Chief Brown their belief that Singer was *Giglio* impaired and gave Brown *Giglio* materials. Defendants argue their disclosures were inconsequential because Chief Brown had access to the *Giglio* materials by virtue of his role as Claremore Police Chief. However, Chief Brown's testimony establishes that prior to defendants' meeting with him on January 8, 2013, he was unaware of any *Giglio* issues regarding Singer.

Based on this evidence, reasonable jurors could conclude defendants disclosed *Giglio* material to Chief Brown.

### Pryor Police Chief Nichols

Pryor Police Chief Nichols first heard Singer was the subject of allegations of *Giglio* impairments from James Willyard, a Pryor police officer.  Subsequently, in a meeting called by Steidley on  January 9, 2013, defendants told Chief Nichols and Willyard that Singer was *Giglio*

impaired, although they did not provide any *Giglio* materials.  After the meeting, Willyard and Singer gave Chief Nichols the *Giglio* materials.

Based on this evidence, while defendants were not the sole source of disclosure to Chief Nichols, reasonable jurors could conclude defendants made *Giglio* disclosures to him.

### Claremore Daily Progress Meeting

Reporter Salesha Wilken, who wrote an article about Steidley's allegations that Singer was *Giglio* impaired, obtained the *Giglio* materials from a state court website.  Defendants did not provide *Giglio* materials to her.  Wilken testified Lair never made any disparaging comments to her about Singer, but Steidley did, to the extent that she implied Singer was the person behind her stories about the Rogers County drug bust.  However, it appears clear from a reading of the article and the transcript of Wilken's taped interview of Steidley on January 30, 2013 that Steidley told Wilken she had determined Singer was *Giglio* impaired.

Based on this evidence, reasonable jurors could conclude Steidley made *Giglio* disclosures to Wilken.

### OCDLA Website Posting

Attorney Josh Lee, who has represented Lair with respect to issues related to Singer, testified he learned of the *Giglio* issue regarding Singer from his law partner and posted comments about it on the OCDLA website.  He denies posting the information at Lair's request.  The OCDLA has no copies of the *Giglio* materials, nor were the materials posted on its website.

Singer has failed to present evidence that would permit reasonable jurors to conclude that outside of the attorney/client relationship, Lair disclosed *Giglio* information to OCDLA.  There is no evidence either defendant provided *Giglio* material to OCDLA.  Further, there is no

evidence that Lee posted comments about Singer's alleged *Giglio* impairment on the OCDLA website at the request or direction of Lair.

Thus, based on the evidence, no reasonable jury could conclude that defendants provided *Giglio* material to the OCDLA or that Lee posted his comments about Singer on the OCDLA website at the request or direction of Lair.

### b. Whether Singer Suffered a "Chilling" Injury

Defendants contend Singer has presented no evidence of an "injury that would chill a person of ordinary firmness from continuing to engage" in protected activity.  In support of this contention, they argue: (1) Singer was already *Giglio* impaired because of the earlier car wreck incident; (2) he has maintained his employment and is not currently on modified duty; (3) not all of his cases have been stayed indefinitely; and (4) if he *were* to lose his employment, his termination would be at the sole discretion of his employer and could not be attributed to defendants, because the *Giglio* materials were not manufactured.

In the eyes of at least one court in a federal case in the Northern District of Oklahoma, Singer's untruthfulness about the car wreck had to be disclosed to defense counsel pursuant to *Giglio*.  Ultimately, however, the court determined Singer's testimony concerning the basis for his affidavit for a search warrant in the case was credible despite the evidence of his earlier lie about the car wreck, and it denied a motion to suppress evidence.  And even if one assumes Singer was already *Giglio* impaired, it does not necessarily follow that Singer cannot suffer additional impairment and/or injury from defendants' disclosure of *Giglio* material related to the *Sunday* case.

The evidentiary materials before the court show that, in the period immediately after defendants' disclosures of *Giglio* materials until approximately February 22, 2013, the CPD did

not permit Singer to conduct any criminal investigations.  Further, Chief Brown testified that if

Singer were to be found guilty of perjury, he would have no choice but to fire him.  Additionally,

a perjury investigation (launched by Steidley's office and subsequently transferred to the

Oklahoma District Attorney for District 10 and then to the Oklahoma District Attorney for

District 2) is still pending, and the District Attorney for District 10 has stated he was prepared to

file perjury charges against Singer before the Attorney General reassigned the case to another

district attorney.

The court concludes that a reasonable jury could find the news article damaged Singer's

reputation in the community at large and the law enforcement community in particular. In

addition, a reasonable jury could conclude these types of injuries would be sufficiently "chilling"

to discourage Singer from exercising his First Amendment rights of free speech and association

in the future.

### 2. Defendants' Motivation

The third element of Singer's First Amendment retaliation claim is whether defendants'

actions were "substantially motivated as a response to the plaintiff's exercise of constitutionally

protected conduct."  *Worrell*, 219 F.3d at 1212.

The court starts its analysis of this element from the premise that "[a]n act taken in

retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if

the act, when taken for a different reason, would have been proper."  *DeLoach v. Bevers*, 922

F.2d 618, 620 (10th Cir. 1990). *See also Howards v. McLaughlin*, 634 F.3d 1131, 1143 (10th

Cir. 2011), reversed and remanded on other grounds ("Even if an official's action would be

unexceptional if taken on other grounds, when retaliation against Constitutionally-protected

speech is the but-for cause of that action, this retaliation is actionable and subject to recovery.").

21

"Intent to inhibit speech . . . can be demonstrated either through direct or circumstantial evidence." *McCook v. Springer Sch. Dist.*, 2002 WL 1788529, at *7 (10th Cir. Aug. 5, 2002). However, "proof of an official's retaliatory intent rarely will be supported by direct evidence of such intent." *Poole v. County of Ontero*, 271 F.3d 955, 962 (10th Cir. 2001) (citation omitted). In *McCook*, the court applied the test for examining intent in the context of a summary judgment motion based on qualified immunity. 2002 WL 1788529, at *7. Under that test, defendants must make "a prima facie showing of the reasonableness of the challenged conduct." *Id.* If defendants meet this burden, then the burden shifts to plaintiff to present evidence defendants "acted on the basis of a culpable subjective state of mind." *Id.*

Applying the objective reasonableness test, defendants have met their burden of showing they made the disclosures to the police chiefs out of concern that Singer was *Giglio* impaired. [Dkt. #80, Ex. N., Steidley Affid.].  Singer, however, has presented circumstantial evidence that the disclosures were in retaliation for his criticism of their performance in office.  Specifically:

- The District Attorney's office reviewed the alleged *Giglio* material in August 2011 and was aware of alleged inconsistencies between the videotaped suspect interview and Singer's claim that he had obtained a confession.  Defendants took no action at the time, and indeed, charged the suspect with, *inter alia*, Second Degree Rape by Instrumentation.[16]

- According to Stansill's Report, he had no meetings with Steidley and Lair about Singer's investigation of the Sunday case between August 30, 2011 and "early January 2013," and he was not asked to prepare the report until January 9, 2013.

- Singer has presented evidence that he was a very vocal critic of Steidley and Lair. In the summer of 2011, he met with Steidley and expressed concern about Lair.  By the fall of 2012, he had become extremely, and openly, critical of Steidley, Lair and the District Attorney's office.  He complained to judges, attorneys, prosecutors and law enforcement

---

[16] This does not necessarily support a conclusion that Singer made no false statements in his affidavits.  One might conclude from the Stansill report that—notwithstanding the alleged discrepancy between the videotape and Singer's affidavits—the District Attorney filed the rape charge because the victim, when interviewed by assistant district attorneys, confirmed Sunday had put his fingers in her vagina against her will.

personnel. He told another officer that his wife was planning on running against Steidley in the next election. On November 21, 2012, he complained about Steidley to one of her ADA's, Tim Wantland.

- Singer was interviewed in connection with the Claremore Daily Progress's article on the aftermath of a large-scale drug bust in Rogers County and Singer provided information that was critical of the DA's performance. The article appeared on January 6, 2013.[17]

- Steidley and Lair met with Chief Brown on January 8, 2013, and with Chief Nichols on January 9, 2013.  On February 1, 2013, the Claremore paper published the story about defendants' disclosure of alleged *Giglio* material to defense attorneys in a case Singer had investigated.  The article included statements made by Steidley that she believed Singer was *Giglio* impaired.

Based on the 18-month interlude between the emergence of the alleged *Giglio* issue and defendants' disclosures of the issue, Singer's mounting criticism of the DA's office during that same period, and the temporal proximity between the Claremore newspaper article and defendants' disclosures,  a reasonable jury could conclude that defendants' disclosures were substantially motivated by Singer's criticism of their performance in the District Attorney's office.  Therefore, defendants' motion for summary judgment on the First Amendment retaliation claim must be denied.

### B. Slander, Libel and Defamation Claims

Singer asserts claims of libel, slander and defamation against defendants in the First Amended Complaint.  These related claims are defined as follows:

"Libel" is statutorily defined as

. . . a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation, or any malicious publication as

---

[17] Defendants argue there is no evidence Steidley knew about any of the criticism except for Singer's criticism of Lair in the July 2011 meeting between Steidley and Singer.  However, Salesha Wilken testified Steidley, through innuendo, conveyed her belief that Singer was the source for Wilken's January 6, 2013 article.

aforesaid, designed to blacken or vilify the memory of one who is dead, and tending to scandalize his surviving relatives or friends.

12 Okla. Stat. § 1441.

"Slander" is statutorily defined as

. . . a false and unprivileged publication, other than libel, which . . . [t]ends directly to injure [any person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profit . . . [or]   [w]hich, by natural consequences, causes actual damage.

12 Okla. Stat. § 1442.

To impose liability for defamation, plaintiff must plead and prove:

1. A false and defamatory statement;

2. An unprivileged publication to a third party;

3. Fault amounting at least to negligence on the part of the publisher; and

4. Either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication.

*Trice v. Burress*, 137 P.3d 1253, 1257 (Okla. Civ. App. 2006).  Additionally, if the plaintiff is a "public official," he must establish the defendant's statements were made with "actual malice"—that is, with knowledge that the statements were false or with reckless disregard of whether they were false or not.  *Jurkowski v. Crawley*, 637 P.2d 56, 58 (Okla. 1981) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)).[18]  Defamation includes both libel and slander.  *See* Restatement (2d) of Torts § 558 (1977).

---

[18] In *Torix v. Brown*, 295 P.3d 1138, 1141 (Okla. Civ. App. 2012), the appellate court held that a police officer is a "public official" for purposes of proving defamation.  Further, in *Peterson v. Grisham*, 594 F.3d 723 (10th Cir. 2010), the Tenth Circuit held that plaintiffs—an Oklahoma District Attorney, a former Shawnee police officer and a former Oklahoma state criminologist—were "public officials" for purposes of 12 Okla. Stat. § 1443.1.

The parties sharply dispute whether defendants made false statements about Singer.[19] Singer contends, "In August of 2011, after a thorough review of Detective Singer's investigative materials in the *Sunday* case and discussion of the merits of the case, Defendants decided to rely on Detective Singer's materials and charge Matthew Sunday with a number of crimes" and "[e]ighteen months later, after Detective Singer's criticisms of Defendants' performance culminated in a January 6, 2013 newspaper article critical of Defendants, Defendants used Detective Singer's *Sunday* materials as a basis for claiming that Detective Singer is *Giglio*-impaired and that he committed perjury." [Dkt. #90, 25-26]. For their part, defendants assert "[t]he report and affidavits prepared by Officer Singer in the *Sunday* Case falsely represented that Mr. Sunday had admitted that he had inserted his finger into the alleged victim's vagina "against her will." [Dkt. #80 at 7; Dkt. #80, Ex. C, Affidavit for Search Warrant; Dkt. #80, Ex. D, Arrest Affidavit].

Defendants assert the alleged disclosures were nothing more than opinions and are therefore not actionable. "As a general rule, statements which are opinionative and not factual in nature, which cannot be verified as true or false, are not actionable as slander or libel under Oklahoma law." *Metcalf v. KFOR-TV, Inc.*, 828 F. Supp. 1515, 1529 (W.D. Okla. 1992) (citing *Miscovsky v. Okla. Publ'g Co.*, 654 P.2d 587, 593-94 (Okla. 1982)). "However, if an opinion is stated as or is in the form of a factual imperative, or if an opinion is expressed without disclosing the underlying factual basis for the opinion, the opinion is actionable under Oklahoma law if the opinion implies or creates a reasonable inference that the opinion is justified by the existence of

---

[19] In his First Amended Complaint, Singer alleges Steidley and Lair "manufactured" evidence of a *Giglio* violation to destroy his career and ruin his reputation, and intentionally, maliciously or negligently disclosed or "published" the manufactured evidence to the newspaper, a defense attorneys' website, and the Claremore and Pryor police chiefs. [Dkt. #30, First Amended Complaint, ¶¶20-22]. The evidentiary materials before the court, however, do not support Singer's claim that defendants "manufactured" any evidence.

undisclosed defamatory and false facts." *Id.* at 1529 (citing *McCullough v. Cities Serv. Co.*, 676 P.2d 833, 835 (Okla. 1984); Restatement (Second) of Torts § 566 (1977)).

Whether a statement is one of fact or of opinion is a question of law for the court. *Metcalf*, 828 F. Supp. at 1529. And an understanding of the *Giglio* decision is essential to this determination.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that once a criminal defendant has requested exculpatory evidence, suppression of such evidence by the prosecutor violates due process if the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor, Subsequently, in *Giglio*, the court held that where the reliability of a witness may be determinative of guilt or innocence of a criminal defendant, nondisclosure of material evidence affecting the reliability of the witness justifies a new trial. 405 U.S. at 153. Thus, suppression of *Giglio* witness impeachment material is a type of *Brady* violation. *See United States v.* Bagley, 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule"); *United States v. Trujillo*, 136 F.3d 1388, 1393 (10nth Cir. 1998) ("Impeachment evidence certainly fails within the *Brady* rule.").

A defendant who seeks a new trial based on an alleged *Giglio* violation must show that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. *U.S. v. Torres*, 569 F.3d 1277, 1281 (10th Cir. 2009). "Evidence is 'material' only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 1282. And [a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* An evaluation of a *Giglio* violation must be made on a case-by-case basis. *Id.* Accordingly, under

*Brady* and *Giglio*, the prosecution must disclose during pretrial discovery "evidence which, in the eyes of a neutral and objective observer, could alter the outcome of the proceedings." *U.S. v. Jordan*, 316 F.3d 1215, 1252 (11th Cir. 2003).

Under *Giglio*, defendants had a duty to determine whether discrepancies between Singer's sworn affidavits and the suspect interview must be turned over to criminal defendants in cases in which Singer was a witness.  And inherently, that determination required the District Attorney to form an opinion about whether the evidence was "evidence which, in eyes of a neutral and objective observer, could alter the outcome of proceedings." *Jordan*, 316 F.3d at 1252.  Thus, the court concludes defendants' statements that Singer was *Giglio* impaired were opinions rather than statements of fact.

The facts establish defendants opined to Chief Brown, Pryor Police Chief Nichols and Officer Willyard that Singer was *Giglio* impaired.  Additionally, Steidley, in an interview with *Claremore Progress* reporter Salesha Wilken, shared her opinion that Singer was *Giglio* impaired. Defendants gave Chief Brown the *Giglio* materials which formed the basis for their opinion. They did not give *Giglio* materials to Chief Nichols. However, they disclosed  the underlying factual basis for their opinion.  Similarly, Steidley did not provide *Giglio* material to Wilken, but described to her the basis for her opinion.  Therefore, the statements to Chief Brown, Chief Nichols and Wilken are not actionable, and defendants are entitled to summary judgment on Singer's claims for libel, slander and defamation.

Furthermore, and as an additional basis for granting summary judgment on these claims, the court has reviewed the video of the suspect interview, the enhanced audio recording of the interview and the transcript of the enhanced audio,[20]  and has compared the transcript of the

---

[20] The transcript of the enhanced audio recording [Dkt. #80, Ex. F], which designates the inaudible portions as "unintelligible," appears to accurately reflect the enhanced audio recording. Therefore, although the transcript was

interview to the Report of Investigation, the Arrest Affidavit and the Affidavit for Search Warrant.

In the Report of Investigation, Singer made no representation that Sunday confessed to having inserted his finger into the alleged victim's vagina "against her will." [Dkt. #80, Ex. B].

In the Affidavit for Search Warrant, Singer stated that the alleged victim told him "Sunday began kissing [name redacted], put his hand into her panties, and inserted his finger into her vagina. This occurred without [name redacted] consent and against her will." [Dkt. #80, Ex. C at 3]. Singer also stated that Sunday told him he "began kissing [name redacted], put his hands in her panties, and put his finger into her vagina" and "[t]his occurred without [name redacted] consent and against her will." [*Id.*].

Similarly, in the Arrest Affidavit, Singer stated, "The female said that Sunday began kissing her and put his hands into her shorts, inserting his finger into her vagina against her will." [Dkt. #80, Ex. D at 1]. Additionally, Singer stated, "Sunday told your affiant that she [sic] put his finger into the 16-year-old girl's vagina against her will." [*Id.*].

The factual issue of whether Sunday acted against the alleged victim's will was legally significant in order to establish the element of force set forth in 21 Okla. Stat. § 1111. *See* footnote 2, above.

A review of the enhanced audio recording and the transcript establishes that during the suspect interview, the following exchange took place:

> Q: [T]he one thing that you and [name redacted] are disputing each other about is you had the right to put your hand in her panties. She said that you did that without her consent and that she told you to stop. That after you pulled your hand out of her pants she said stop and walked away from you. You make it sound like it was an agreement between the two of you to have this sexual encounter and that's the difference.

---

not included in the packet of *Giglio* materials defendants provided to Chief Brown and others, the court has used it as a reference for purposes of this decision.

A:  I—

Q:  Now, I want to say this; you've been real honest up to this point and you're kind of leading me to the conclusion that you have done what every male in the history of men have ever done, let your pecker do some thinking for you.  Let that get out of  control.
. . .

Did you get the impression that [name redacted] wanted your finger in her vagina?

A:  She didn't ask for it but—(unintelligible.)

Q:  You reached down and put your hand in her panties and put your finger in her vagina?

A:  Yes.

Q:  She ain't cool with that.  She's not cool with that now.  What about then?

A:  I wasn't aware she said stop. (Unintelligible).  I didn't hear her.

Q:  But (unintelligible) made it sound like it was after—as she was walking away, like it pissed her off.  Is that possible?

A:  Yeah, that's possible because I just walked straight further into the kitchen at that point.

Q:  So you were—you've been turned on by the idea of having some sexual contact with [name redacted] for about a week now and then things all kind of started falling together; is that fair to say?  She was drinking so she had relaxed inhibitions.  She's in your house where you feel the most comfortable.  And then your wife leaves.  That's a pretty good opportunity for a young man.  There's a kiss and then you reach down and put your hand in her panties and then grabbed her hand and put that on your penis.  Agree?

A:  Yes, sir.

Q:  Does she do anything with your penis?  Or is it kind of a cold exchange?

A:  She—yeah, cold. (Unintelligible).

Q:  Why? I didn't want to do it?  I don't know what to do with it?  This isn't my thing?

A:  Yeah, like she was uncomfortable.

Q:  Because your hope was that she would do something with your penis and she didn't.  What are you going to say to [victim's name redacted] parents?  What do you say to [parents' name redacted]?  What do you say to your wife?

A:  (Unintelligible).
. . .

Q:  And you're being pretty honest with me.  I'm not the only guy in the world you've got to answer to now.  I mean an entire family.

A:  Yes, sir.

Q:  Your family, you and your wife.  Do you have any kids yet?  Probably a good thing; isn't it?

A:  Yes, sir.

Q:  You didn't have the right to put your hand in her panties; did you?

A:  No.
.   .   .
Q:   I mean [victim's name redacted] response to you putting your hand down her pants had to have told you, oh shit, she didn't want that, I've got a problem?

A:   Honestly I did not get that from her.  It may have been there.

Q:   Let me ask you another way.  When did the light come on that you had a problem?

A:  When she—her and [name redacted] went to the back bedroom and we were watching—everybody else was in the front room—and she texted me and said she was going home and that's when I—

Q:  Things had gone too far?

A:  Yes.

[Dkt. #8, Ex. F at 15-23].

Based on its review, the court concludes Singer's statement, contained  in both the

Affidavit for Search Warrant and Arrest Affidavit, that the suspect had admitted he had inserted

his finger into the alleged victim's vagina "against her will" was not accurate.  The suspect

admitted he did not have the victim's permission to do so and that he did not have the right to put his hand in her panties.  However, he never actually admitted he acted against the victim's will, despite Singer's repeated efforts to obtain such an admission.[21]  Therefore, the court concludes defendants cannot be said to have made a false statement when they opined that the *Giglio* information had to be disclosed.

## IV. Conclusion

For the reasons set forth above, defendants' Motion for Summary Judgment [Dkt. # 80] is granted with respect to Singer's claims for libel, slander and defamation and denied with respect to his claim for First Amendment retaliation.

ENTERED this 12th day of February, 2014.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[21] At the hearing on the motion, plaintiff's counsel admitted that Sunday never explicitly made the admission.

31